**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**GERARDO FERRAO RIVERA,**

Plaintiff,

v.

**PUERTO RICO DEPARTMENT OF EDUCATION; COMMONWEALTH OF PUERTO RICO,**

Defendants.

Civil No. 24-1079 (MBA)

## OPINION AND ORDER

Gerardo Ferraro Rivera ("Ferrao") brought this civil action against the Puerto Rico Department of Education ("PRDE") and the Commonwealth of Puerto Rico ("the Commonwealth"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621–634. (ECF No. 1). He also invoked this Court's supplemental jurisdiction over claims arising under Puerto Rico statutory and tort law, including Law 100 of 1959, Law 115 of 1991. (*Id.* at 1-2, 9). Defendants moved to dismiss, and obtained dismissal on all but two counts: religious discrimination and retaliation under Title VII. (ECF Nos. 10, 34). Defendants moved for summary judgment. (ECF No. 85). Plaintiff opposed. (ECF No. 100). The parties filed replies and surreplies. (ECF Nos. 118, 127). For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED**.

## BACKGROUND[1]

[1] The ensuing facts are drawn from Ferrao's Opposing Statement of Undisputed Material Facts, Ferrao's admissions to Defendants' Statement of Undisputed Material Facts, as well as school and disciplinary records whose authenticity is not otherwise in dispute. *See Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 24 (1st Cir. 2008) ("We review the record evidence, making all reasonable inferences in plaintiff's favor."). This narrative begins in 2018, consistent with the parties' pleadings. Still, at a recent conference, Plaintiff challenge any reliance on conduct pre-dating 2022 and alluded to not only the

Ferrao began working at the Escuela Libre de Música (the "School") in 2017, where he taught History and Social Studies to students ranging from sixth to eleventh grade. (ECF No. 102-1 at 40). Ferrao describes himself as an "atheist/nonbeliever" who doesn't "identify with any religion or religious tradition." (*Id.* at 42).

The School is the only public school in Puerto Rico that has both a music program and an academic program. (ECF No. 101 at 5). Ferrao worked exclusively in the academic program, where class periods run ninety minutes-long, as opposed to the fifty minutes-long class periods in the music program. (ECF No. 102-1 at 49). Pursuant to the School's teacher substitution plan, which it adopted in 2019, whenever a teacher was absent from work, available teachers in their TADO period, which is the Spanish acronym for "additional duties," were tasked with serving as substitute teachers. (ECF No. 97-1). This substitution plan, however, only applied to academic teachers, whose class periods run ninety minutes-long, not to music teachers. (ECF No. 102-1 at 49).

Magaly Rosario ("Rosario"), the School's principal and Ferrao's immediate supervisor, has worked for the PRDE since 1994, and began working at the School in 2018. (ECF No. 102-1 at 5). Soon after, Rosario received a referral from the school counselor and a letter from a concerned parent about "statements by students concerning religious matters in Mr. Ferrao's classroom," which were making students feel "deeply offended and uncomfortable." (*Id.* at 60; ECF No. 97-10 at 3). The parent alleged that Ferrao had been "speaking disrespectfully about religions and God, and offending those" who held "religious values," and asked the principal to investigate the matter. (ECF No. 97-10 at 3). As part of this complaint, the school counselor also compiled notes from students, which were

---

prior Opinion and Order, but also rulings at a status conference. (ECF No. 120). Upon review of the relevant minute entry, the Court did not impose any limitations (discovery or otherwise) on matters related to religious discrimination and disciplinary investigations. Rather, the Court ordered Defendants to produce "[a]ll personnel, disciplinary, and employment records relating to Plaintiff from 2017 to the present." (ECF No. 66). The only discovery matters limited to 2022 were Rosario's personal communications regarding Ferrao unrelated to Plaintiff's religious discrimination claim. (*Id.*).

submitted anonymously for fear of "retaliation," recounting Ferrao's conduct in class. (*Id.* at 2). These notes alleged that Ferrao made statements such as: the Bible is "a bunch of garbage," "Catholics are abusers and thieves," "masses are shit," and that "God did not miraculously put Jesus inside of Mary but rather that he thinks they had relations and it is all a crock of shit." (*Id.* at 4, 7, 9). In September 2018, Rosario met with Ferrao to address these statements, as well as his screening of the R-rated film *300* in class, which made some students and parents feel uncomfortable. (*Id.* at 1).

Beginning in the 2019 school year, Rosario attempted to meet with Ferrao in her office to address his refusal to comply with the School's teacher substitution plan. (ECF No. 102-1 at 49). This meeting was ultimately not held because Ferrao arrived accompanied by a lawyer from the Federación de Maestros, which is not the PRDE's exclusive recognized teacher association. (ECF No. 97-9 at 3). The meeting was followed up with an October meeting at the regional superintendent's office, which was also adjourned for the same reason. (*Id.*). These two unfruitful meetings resulted in Ferrao's first referral to the PRDE legal division for disciplinary action. (*Id.* at 2).

Between 2021 and 2022 the PRDE legal division investigated the disciplinary referral, and in March 2022, Ferrao received a letter informing him that the PRDE had conducted an investigation into his "inappropriate behavior that is detrimental to the good name of the Department." (ECF No. 101-5 at 1). As grounds for disciplinary action, the letter cited Ferrao's refusal to follow the substitution plan, "bad language in the classroom," screening of films with "high sexual content," and complaints from three female students regarding Ferrao's inappropriate conduct. (*Id.*). Ferrao was ordered to show cause as to why corrective action should not be taken against him. (*Id.* at 19). Ferrao requested an informal administrative hearing initially scheduled for June 2022, which was postponed, at Ferrao's request several times until it finally took place in July, 2023. (ECF No 97-3 at 1).

The March letter followed a February investigative report that included sworn statements from students and parents detailing Ferrao's conduct between 2019 and 2021. (ECF No. 99-1). These sworn

statements alleged, among other things, that Ferrao: "approache[d] female students inappropriately, looking at them with ulterior motives," "'leered' at girls in [] class and would press up against [them] trying to see or brush up against any part of [their] bodies," would show R-rated films to students, failed to notify students of his absences, boasted that the PRDE "could not say anything to him because nowhere does it say that he cannot talk about religion and other things that he talks about in class because it is a history class," and that if students complained about him, "they would fire him and they would bring in a teacher who would fill up the chalkboards every day." (*Id.* at 3, 6, 11, 12, 17, 44, 56).

In June 2022 Ferrao was again referred to the legal division for reasons the parties dispute. (ECF 102-2 at 7). Then, in August 2022, Ferrao was placed under precautionary measures, removed from his teaching position, and assigned an administrative role in the PRDE. (ECF No. 97-2). For background, a teacher may be placed under precautionary measures when a situation may implicate a threat to students, teachers, or other personnel or when a restraining order is issued against a teacher. (ECF No. 102-1 at 5). This can be initiated at the direction of a supervisor or director, but only the PRDE's legal division can make the determination to impose precautionary measures. (*Id.* at 19). The letter placing Ferrao under precautionary measures did not cite a specific instance causing Ferrao's removal from the School but stated that the "Administrative Complaints Investigation Unit is currently investigating one/several complaint(s) filed against you. Accordingly, as a precautionary measure, you are being relocated to the school/office ORE San Juan in the municipality of San Juan." (ECF No. 97-2).

In November 2022 Rosario received an email from the PRDE investigator handling Ferrao's case, indicating that on November 8, the PRDE would be taking voluntary statements from parents in support of his investigation into Ferrao's conduct. (ECF No. 102-1 at 11). The legal division selected which students and parents would be interviewed as part of this process. (*Id.*). Later that same day,

Ferrao participated in a protest outside of the School organized by the Federación de Maestros, of which Ferrao was a member. (*Id.* at 62). The protest was intended to "denounce[] Rosario's arbitrary practices toward teachers," and included "[t]eachers from other regions who had been placed on precautionary measures." (*Id.*). The following day, a group of teachers signed a letter complaining about the protest. (*Id.* at 62). On December 13, 2026, Ferrao was summarily suspended from his position in the PRDE. (ECF No. 90-14). The suspension letter, which supplemented the March intent to file charges letter, listed twenty-one grounds for disciplinary action, stating, in relevant part:

> 1. You refused to follow the Substitution Plan set forth in the School Organization Proposal for the 2019-2020 school year, ratified on May 29, 2019.
>
> 2. You have refused to attend the groups assigned in the Substitution Plan.
>
> 3. You have used profanity in the classroom.
>
> 4. You have shown films in the classroom that are unsuitable for students due to their high sexual content.
>
> 5. By affidavit, the students K.N.S., L.P.J. and A.M.U.[2], expressed concern, discomfort and fear due to the manner in which you observe and approach them.
>
> 6. On May 31, 2022, you approached 12th grade student A.M.U., indicating that you had received a harassment order from the Department of Education with her name on it and that you could not believe it because you had dealt with her so well. This intervention with the student caused the student to feel fearful, unwell and with symptoms of headache and anxiety.
>
> 7. On May 31, 2022, you approached the student L.P.J., 12th grade, to complain to her about the letter of intent to file charges that had arrived from the Department of Education in which the student's name appeared as part of some of the statements made by her. You, in an intimidating manner, requested the mother's telephone number from her. In addition, you instructed her to stop by your classroom at 2:00 p.m. to review the letter you had in your desk. You went on to warn her that you would get to the end of the case and that you had a group of lawyers who would represent you.
>
> 8. On June 1, 2022 at 1:11 p.m., you called the cell phone of Mrs. Sharon Urdaneta, the mother of A.M.U., to let her know that you had a concern, since you had received a letter from the Department of Education, Office of Investigations in which they were letting you know that a complaint had been filed against you, because of which you were dismayed and

[2] Minor students' names have been redacted.

concerned by one of the allegations mentioned in the letter, referring to the allegation of her daughter, A.M.U., in which she indicated that she felt uncomfortable with the way the teacher looked at her and when he approached her. You mentioned this information to the mother, indicating that in those days the students were signing their shirts and several came to you, including the student A.M.U., for you to sign their shirts, to which you stated that you would not sign it, because she had filed a complaint against you. Ms. Urdaneta stated to you that if you are in an investigative process you had no business asking questions of students, much less contacting the parents to ask questions.

9. On November 2, 2022, at 4:45 p.m., you showed up at the Ernesto Ramos Antonini School facilities, in a challenging and intimidating manner, in a vehicle with loudspeakers *(tumba coco)*, to carry out a protest in which you made reference to the school principal, Magaly Rosario, causing classes to be interrupted and the teachers to activate the security protocol to safeguard the students. In his affidavit, the teacher Gonzalez Figueroa stated that this demonstration caused the students, who were in room 503 discussing an assignment, to feel uneasy and worried, as well as the parents who were waiting for their children to be dismissed to pick them up at the end of the school day. As part of your speech, you made reference to the fact that the school principal is persecuting you and other teachers, that she is a principal who does not know music, that she thinks she is a musician because she takes piano lessons, and that she is a terrible principal.

10. By affidavit, the teacher Zenaida Suarez Lorenzo stated that on November 2, 2022, she was in her classroom during the TADO period from 3:30 p.m. to 5:00 p.m., attending to a student, when she began to hear a loud music noise and she recognized you speaking into a microphone. Your speech was directed towards the director, Magaly Rosario, making reference to a workplace persecution, that she did not know about music and that she fabricated cases. Both the student accompanying Ms. Suarez and the teacher felt anxious.

11. By affidavit, the teacher Juditza L. Aguayo Concepcion stated that on November 2, 2022, at 4:50 p.m., during class time, she was in her classroom when she began to hear loud instruments. The noise of the music was increasing to such a level that nothing else could be heard in the classroom. Immediately, several students from the 8th, 9th, 10th and 11th grade entered the classroom, with great anxiety and concern. Among the things that she heard that you were shouting, was about the teachers' lack of ability to educate and to encourage teaching, about the way the school runs, as well as expressing statements of violence and expletives about the school principal.

12. By affidavit, the teacher Amarilis Sanchez Rivera stated that on November 2, 2022, she was in her last class period with the eleventh grade, collecting permission slips and money for the next day's field trip with the students, when at 4:50 p.m. a "voceteo" or "tumba coco" was heard near the school. In her statement, the teacher indicated that it was a moment of astonishment, confusion, and especially concern for the safety of the staff inside the school; and of astonishment and insecurity for the parents who were arriving to pick up their children. The message that the teacher heard was described in detail as an attack against the school principal, Magaly Rosario, indicating in an aggressive, violent and intimidating tone that he had been persecuted by her. The teacher indicates that the precautionary measure in which you find yourself in is due to complaints made by parents and students, and she

cannot understand why you continue to directly and personally attack the director Rosario, both in person and on social networks.

13. By affidavit, the teacher Wendi Rivera stated that on November 2, 2022, she was in her classroom, when at 4:50 p.m. she heard the loudspeaker come on and was able to identify you, talking about the faculty and the school principal. As the teacher went to the hallway on floor 4, she noticed that several students were frightened, as they did not understand what was happening at the time. The teacher expressed concern for the safety of the students. They proceeded to remove the students through another exit area.

14. By affidavit, the teacher Yanira Lopez Caban stated that on November 2, 2022, during the last class period with group 10-1, at around 4:50p.m., the sound of a demonstration began to be heard in the classroom. The classroom is located on the 5th floor. The students and teacher were able to identify you in the protest, causing the students to become upset and uncomfortable and the class was stopped. The teacher expressed in her affidavit that she is concerned for the safety of all those who are part of the teaching community, especially for the safety of the school principal, due to the situation of the attacks through social networks on a daily basis and now with the demonstration in front of the school, that alters the school environment creating an atmosphere of tension for staff and students, who are in anticipation of what you are going to publish next.

15. By affidavit, the teacher Karen Reyes Diaz stated that on November 2, 2022, she was in the classroom giving a test when the noises and the honking altered the environment and interrupted the processes. The teacher indicates that when she was dismissing the students and going downstairs with them, she noticed that there were students crying and that they did not want to deal with the situation. The teacher indicates that students from grade 12 went directly to where you were to confront you and complain about your daily writings, your lies and your attitude towards the school. This confrontation on the part of the students with you brought a lot of concern. Students are constantly hearing from you that their teachers are submissive and fearful and that the school principal is inept.

16. By means of a sworn statement, the teacher Silvette Castro testified that on November 2, 2022, at 4:50 p.m., she was in the "dog kennel" area of the school with her colleague Sybaris Morales and her group of 12-1 when she heard the noise of the bus, causing them to be unable to listen to each other. At that moment, they heard your voice in the protest and proceeded to evict the students through the back door so that they would not come into a direct or face-to-face contact with the protest. They feared for the safety of the students and the crowd. The teacher stated that the school's name is on everyone's lips in a way that affects them, that she hears the students be uncomfortable with everything that has happened. She is concerned that you have come to the school during school hours to offend and shout complaints in front of everyone and with the use of loudspeakers, specifically, saying that the teachers are submissive is an offensive expression.

17. By affidavit, the teacher Nicole Sepulveda Rodriguez stated that on November 2, 2022, she was in the 4th floor classroom with her group during the last class period from 3:30 p.m. to 5:00 p.m., when at 4:45 p.m. she heard the protest of pleneras [plena-style singing] and the slogans of "injunction and injustice of the administration," causing interruption [to the] flow

of her class. Both the teacher Sepulveda and the students were uncomfortable.

18. By affidavit, the teacher Blanca Colon stated that on November 2, 2022, at 4:50 p.m., she saw and heard a black van with big horns in front of the school demonstrating against the faculty. The teacher identifies you, using profanity during the demonstration. The faculty had to evict the students through the second floor. The teacher indicates that the students felt uncomfortable and that the parents are upset about the situation. The teacher states that she did not dare to leave the school because she felt intimidated.

19. By affidavit, the teacher Mario Vazquez Asencio stated that on November 2, 2022, he was in the school library at 4:50 p.m. when he began to hear loudspeakers located in front of the school. He heard your voice, expressing yourself negatively about the school's principal and about the administrative and teaching operations. There was concern for the safety of the students. Some concerned parents entered the school so that the students would not go out alone. This incident disrupted the entire school climate.

20. By affidavit, the student H.A.R. stated that on November 2, 2022, he witnessed the demonstration, but that the teacher Ferrao said things that he did not understand. He further stated that he was a student of yours and that you liked to talk bad about the principal in class and said things about religion that you should not say, such as, for example; "that there was more than one god"; in addition to talking bad about churches.

21. In a communication received on December 9, 2022, subscribed by Mr. Jorge A. Santiago, regional superintendent of the San Juan Regional Educational Office, it is certified that during the time you have been placed under the precautionary measure in the Finance Office of the ORE of San Juan, Mr. Pedro Cruz Vergara, director of the Finance Office, indicated that you have not wanted to perform any of the tasks that may be delegated to you, in said office, while the measure is in effect. Mr. Jorge Santiago states, in the communication sent, that he has had two interventions with you. The first, due to a recording you made during a tour of the ORE offices; and the second intervention, because you were recording some employees who are also under precautionary measures in a temporary area assigned after Hurricane Fiona. Both recordings were disseminated on social media.

(ECF No. 90-14).

**UNDISPUTED FACTS**

The Court finds the following facts to be undisputed:

- In September 2018, Rosario met with Ferrao to discuss reports about his in-class conduct, after receiving a referral from the school counselor. This conversation addressed, among other things, "[s]tatements by students concerning religious matters in Mr. Ferrao's classroom," as well as his screening of the R-rated movie *300*. (ECF Nos. 97-10, 102-1 at 60).

- Following unfruitful attempts to meet with Ferrao, in October 2019, Rosario referred Ferrao to the PRDE legal division for the stated reason of his refusal to follow the teacher substitution plan. (ECF No. 102-1 at 7, 60).
- Between 2019 and 2022, the PRDE legal division conducted an investigation into Ferrao's conduct. This investigation was completed in February 2022. Ferrao learned of the investigation through the March 2022 letter of intent to file charges letter. (*Id.* at 8–9, 51).
- Ferrao was again referred to the PRDE legal division in June 2022. (*Id.* at 7).
- In August 2022, Ferrao was removed from the School and placed under precautionary measures status and sent to work a regional office in San Juan. (*Id.* at 29; ECF No. 97-2).
- On November 2, 2022, Rosario received an email from a PRDE legal division investigator, indicating that on November 8, 2022, the legal division would be interviewing students regarding the disciplinary investigation against Ferrao. (ECF No. 102-1 at 11).
- On November 2, 2022, Ferrao participated in a protest outside the School organized by the Federación de Maestros, along with other teachers placed under precautionary measures. The protest occurred on or about the School's dismissal time. The following day, a group of teachers signed a letter complaining about the protest. (*Id.* at 62–63).
- On November 8, 2022, the PRDE legal division conducted student interviews based on complaints against Ferrao. The legal division selected which students to interview. (*Id.* at 63).
- Ferrao was suspended from his post on December 13, 2022. (*Id.* at 64–65). The suspension letter cited twenty-one numbered charges. Charges one to five restate the charges in the March 2022 disciplinary letter. Charges six to eight state that Ferrao approached and challenged students who submitted complaints about him. Charges nine to nineteen concern Ferrao's participation in the protest. Charge twenty concerned Ferrao's in-class statements regarding

religion. Charge twenty-one concerned Ferrao's recording of coworkers, and his refusal to perform his tasks while he was under precautionary measures. (*Id.* at 64–65).

**STANDARD OF REVIEW**

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion and identifying those portions" of the record "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has satisfied this burden, however, the burden shifts to the non-moving party to show that there is still "a trial worthy issue as to some material fact." *Cortés-Irizarry v. Corporación Insular*, 111 F.3d 184, 187 (1st Cir. 1997).

Through summary judgment, courts "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992). The Court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, the Court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The Court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## ANALYSIS

"Title VII's primary objective is to ensure a workplace where individuals are not discriminated against because of their race, ethnicity, religion, or gender." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). The statute makes it unlawful for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" protected characteristics, or "to limit, segregate, or classify [its] employees ... in any way which would ... adversely affect [an individual's] status as an employee, because of such individual's" protected status. 42 U.S.C. § 2000e-2(a). These provisions create two causes of action commonly known as disparate treatment claims (or intentional discrimination), and disparate impact claims. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Moreover, Title VII includes provisions to impede an employer from engaging in retaliatory actions against employees who engage in certain protected activities. *See Abril-Rivera v. Johnson*, 806 F.3d 599, 608 (1st Cir. 2015); 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.").

Unless direct evidence of discrimination is produced, courts normally employ the oft-cited burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), to determine whether the employer's actions were the result of impermissible discrimination. *See Mojica v. El Conquistador Resort and Golden Door Spa*, 714 F. Supp. 2d 241, 255 (D.P.R. 2010) (explaining that the "the term 'direct evidence' normally contemplates only those statements by a decisionmaker that directly reflect the alleged [discriminatory] animus and bear squarely on the contested employment decision," and that "comments by non-decisionmakers ... normally are not 'direct evidence' of [discriminatory] animus") (quoting *Vesprini v. Shaw Contract Flooring Services, Inc.*, 315 F.3d 37, 41 (1st Cir. 2002)). In the first step of this framework, the plaintiff makes out a prima facie case. *Id.* Then, the

burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason." *Id.* If the defendant produces such a reason, the plaintiff is then afforded an opportunity to prove that the reasons for the employer's employment decision were pretextual. *Id.* Within this framework, although the burden of production shifts between parties, the burden of proof ultimately rests with the plaintiff. *See Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012).

A Title VII plaintiff, however, may also eschew the *McDonnell Douglas* burden-shifting framework and resort to a motivating-factor or "mixed-motive" theory to prove discrimination. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (drawing the distinction between single-motive and mixed-motive cases); *Burns v. Johnson*, 829 F.3d 1, 12 (1st Cir. 2016) ("After *Desert Palace*, this circuit has not required a plaintiff to use *McDonnell Douglas* with the mixed-motives theory."). Under this theory, a Title VII plaintiff need only prove that "both legitimate and illegitimate reasons motivated the employer's decision," rather than proving that an improper reason was the "sole basis" for the decision. *Desert Palace, Inc.*, 539 U.S. at 94; *Sher v. U.S. Dept. of Veterans Affairs*, 488 F.3d 489, 508 (1st Cir. 2007). "[U]nder both approaches, plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009) (citation modified)

**a. Religious Discrimination**

Ferrao, who proceeds on a motivating-factor theory, alleges that even if the PRDE had alternative grounds to discipline him, his religious beliefs played a role in its determination. *See Chadwick*, 561 F.3d at 45. He argues that any legitimate reason the PRDE may offer, "including the substitution plan, the films, and the student complaint, is fully consistent with religion having *also* been a motivating factor." (ECF No. 100 at 8). A review of the record, however, dispels his contentions. At the summary judgment stage, whether Ferrao frames his claim under the *McDonnell Douglas*

framework, or under a motivating factor theory, he must, at least, create a genuine dispute that religious discrimination was "more probably that not" a motivating factor in his suspension. *Burns*, 829 F.3d at 12. To do so, he must adduce "minimally sufficient evidence to permit a reasonable factfinder to conclude" that religious discrimination motivated his suspension. *See Dávila v. Corporación De P.R. Para La Difusión Pública*, 498 F.3d 9, 16 (1st Cir. 2007). Because he has not done so, summary judgment is warranted.

The PRDE contends that Ferrao was disciplined for four legitimate non-discriminatory reasons: 1) his refusal to comply with the School's teacher substitution plan; 2) his disparaging classroom statements concerning religion; 3) his showing of "obscene" materials to students in class; and 4) allegations of inappropriate conduct towards female students. (ECF No. 85 at 30–32); *see O'Horo v. Boston Med. Ctr. Corp.*, 131 F.4th 1, 14 (1st Cir. 2025) (noting that producing a non-discriminatory reason "is not an onerous task: The employer need only articulate a reason which, on its face, would justify a conclusion that the adverse employment action was taken for a nondiscriminatory motive") (citation modified).

Ferrao counters that School officials had knowledge of his religious beliefs, and based on this knowledge, a reasonable jury could find that the PRDE "punished the expression, or perception, of non-belief and labeled it disrespect." (ECF No. 100 at 9).[3] As proof of discriminatory animus, Ferrao points to minutes from his 2018 meeting with Rosario, in which she addressed "situations of a religious nature" in his class, and the complaints she received concerning his "religious comments" to students.

---

[3] Much effort was spent in the summary judgment fillings to dispute whether the School or the PRDE had actual knowledge of Ferrao's religious beliefs. However, an employer's actual knowledge of an employee's religious belief is not required to state a Title VII claim. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015) ("[T]he intentional discrimination provision prohibits certain *motives,* regardless of the state of the actor's knowledge. Motive and knowledge are separate concepts."). Moreover, the record as a whole, viewed in Ferrao's favor, supports an inference that the School was at least aware of his religious beliefs.

(ECF No. 100 at 2). He also points to charge twenty of the December suspension letter, which cites a student complaining that Ferrao "said things about religion he should not say," and that Ferrao liked "talking bad about churches." (ECF No 90-14). According to Ferrao, the sum of these two instances, coupled with 2019 text message in which Rosario states that Ferrao would return to the School "over my dead body,"[4] supports an inference that religious discrimination at the School "infected" the PRDE's adverse employment actions against him.[5] (ECF No. 100 at 9).

Although these "threadbare" allusions to a religious motive may have survived the pleading stage, their insufficiency is "fatal" at the summary judgment stage. *Deangelis v. Hasbro, Inc.*, 165 F.4th 646, 657, 659 (1st Cir. 2026) (reversing a dismissal of a Title VII claim because, at the pleading stage, the defendant employer had not provided an "obvious non-discriminatory explanation"); *Frith*, 38

---

[4] Ferrao attempts to repurpose Rosario's 2019 text messages stating that "Ferrao's got me pissed me off"; "Over my dead body will he return next year"; and "He's going to screw up any time now and I'll be waiting for the moment" to imply that Rosario harbored an impermissible animus against him. (ECF Nos. 100 at 3; 102-1 at 60). However, at the motion to dismiss stage, this Court held that "nothing about the context (a chat between two female staff members at the school) leads to an implication that the comments reflect gender bias." (ECF No. 34 at 16). Similarly, despite Ferrao's attempt to recontextualize these messages to his religious discrimination claim, the Court finds that they do not evince an impermissible animus. *See Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000) (holding that an employer that may have "harbored hostility" and treated employee "unfairly," standing alone, was not probative of discriminatory animus).

[5] Ferrao cites *Staub v. Proctor Hospital* for the proposition that where "unlawful animus that is intended to cause an adverse action, and that act is a proximate cause of it, the employer is liable even though another official made the final decision." (ECF No. 100 at 9); *see* 562 U.S. 411, 419-22 (2011). Meaning that, because Rosario initiated Ferrao's disciplinary referrals to the PRDE legal division, her alleged discriminatory animus proximately caused his suspension even though she was not the final decision maker. (ECF No. 100 at 9). This type of lability is sometimes referred to as a cat's paw theory. *See Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (explaining that "cat's paw liability can attach if an employee performs an act motivated by animus that is intended to cause an adverse employment action, and if that act is a proximate cause of an adverse employment action"). However, to succeed on that theory Ferrao still needs to create a genuine issue as to whether Rosario was motivated by a discriminatory animus, which, as discussed further below, he has not. *See Ameen*, 777 F.3d at 71 (holding that a cat's paw theory of liability "absolutely require[s]" a finding that the person who provided information leading to an adverse employment action was motivated by an impermissible animus).

F.4th at 275 (declining to "infer racial discrimination based on factual allegations that are 'just as much in line with' [a] non-discriminatory explanation") (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 9 (1st Cir. 2011)); *see also Perez-Abreu v. Metropol Hato Rey, LLC*, No. CV 21-1196 (ADC), 2024 WL 4544710, *7, 2024 LX 243348, *31 (D.P.R. Oct. 21, 2024) (finding that ambiguous "off-hand remarks" over a ten month period were insufficient to fend off summary judgment in a discrimination claim).

Ferrao's argument not only misses the mark, it turns a Title VII claim on its head. Title VII prohibits discrimination motivated by animus against a protected trait. It does not, however, shield those that violate their employers' policies and then cry wolf when they are discharged. *See Stratton*, 113 F.4th at 38 ("Put broadly, Title VII's substantive provision protects against discrimination based on who one is (i.e., a member of a protected class)…."); *Chadwick*, 561 F.3d at 47 ("After all, the essence of employment discrimination is penalizing a worker not for something she did but for something she simply is."); *Rivera v. Puerto Rico Aqueduct and Sewers Auth.*, 331 F.3d 183, 189 (1st Cir. 2003) ("[R]egardless of the evidentiary course the plaintiff charts, she must show that alleged discriminatory conduct was not "merely tinged" with remarks abhorrent to her religion but actually was, in either character or substance, discrimination because of religion."). To be sure, the September 2018 meeting and the subsequent investigation discussed "situations of a religious nature." But the PRDE was responding not to Ferrao's status as a non-believer, but to student and parent complaints that Ferrao was disparaging those of a given faith. Title VII is not such a *carte blanche*. *See Jackson v. State of Alabama State Tenure Commn.*, 405 F.3d 1276, 1290 (11th Cir. 2005) (finding no discrimination where teacher wrote "inflammatory and disparaging letters" to school board); *Smizer v. Community Mennonite Early Learning Ctr.*, 538 Fed. Appx. 711, 714 (7th Cir. 2013) (unpublished) (finding no discrimination where teacher was fired for disparaging Facebook posts).

Aside from the two incidents cited above, Ferrao does not point to any other evidence suggesting discriminatory animus against him. *See Pérez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir.

2001) ("[A]n absence of evidence on a critical issue weighs against the party—be it the movant or the nonmovant—who would bear the burden of proof on that issue at trial."). Moreover, neither the March disciplinary letter nor the December suspension letter allude—directly or indirectly—to Ferrao's religious beliefs. Rather, they reference religion in relation to a body of incidents that raised concern among students and parents about Ferrao's conduct in the classroom. *See Snyder v. Arconic, Corp.*, No. 23-3188, 2024 WL 3813173, *3, 2024 U.S. App. LEXIS 20431, *6 (8th Cir. Aug. 14, 2024) (per curiam) (refusing to allow a Title VII plaintiff to transform a claim showing termination for improper conduct into a claim based on termination because of beliefs). For instance, what Ferrao attempts to sidestep in his threadbare allusions to religion in the two instances he cites, is that the substance of the "situations of a religious nature" that Rosario, and then the PRDE addressed, were reports about Ferrao disparaging religion in the classroom. Indeed, the disciplinary investigation into Ferrao's classroom conduct cites several statements he allegedly made about religion, which included: "Jesus is not the son of God and that God did not miraculously put Jesus inside of Mary but rather that he thinks they had relations and that it is all a crock of shit," "Catholics are abusers, they act like saints but rape girls, they are thieves," "Christians are shit," "Christ is also shit." (ECF Nos. 97-10 at 7; 101-25 at 2).[6] A reasonable juror could not conclude that the PRDE, acting on these complaints,

---

[6] Ferrao does not dispute that his style of teaching History caused "anger" and disagreement among students and parents causing them to file complaints against him. (ECF No. 101-4 at 52). Rather, he disputes that he made any "disparaging or hurtful comments concerning particular religions," and argues that these statements must be disregarded as hearsay. (ECF No. 100 at 8); *see* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 802. However, the Court does not consider these statements for their truth. Critically, here they are offered by Defendants to prove that the PRDE acted on non-discriminatory grounds to suspend Ferrao. (ECF No. 118 at 17); *see United States v. Murphy*, 193 F.3d 1, 6 n.2 (1st Cir. 1999) ("[A]n out-of-court statement might be offered to show that the declarant had certain information, or entertained a specific belief, or spoke a particular language; or it might be offered to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action)"); *Ira Green, Inc. v. Mil. Sales & Serv. Co.*, 775 F.3d 12, 19 (1st Cir. 2014) ("Rumors may be admitted, without regard to their accuracy, to show their motivating effect on the listener."). As such, whether the student complaints are an accurate account of Ferrao's classroom statements about religion is immaterial. What matters, in this context, is that the decisionmaker believed them to be true, and acted

engaged in religious discrimination.

Indeed, Title VII "requires the employee's religious observance, belief, or practice to have been a motivating factor in an employment decision made by the employer." *See Deangelis*, 165 F.4th at 658. Ferrao argues that this standard is satisfied because "religious content was part of the reason for discipline." (ECF No. 100 at 8). But religious content is not enough. Title VII requires religious observance, widely understood, to be a motivating factor in an employer's adverse employment action, and it can hardly be said that Ferao's in-class statements disparaging religion constitutes religious observance even under the broadest understanding of that term. *See* 29 C.F.R. § 1605.1 ("[R]eligious practices ... include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views."). As Defendants point out, "[t]eaching history may require discussion of religion, but that does not encompass disparaging or hurtful comments concerning particular religions, nor were such comments part of the [PRDE] curriculum for the grades plaintiff taught." (ECF No. 85 at 31).

Ultimately, the question before the Court, is not whether Ferrao's conduct amounted to reasonable grounds for dismissal. Rather, the issue is whether a reasonable juror could conclude that the PRDE was motivated by a forbidden animus in disciplining Ferrao. *See Mesnick,* 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions."); *Pina v. Children's Place*, 740 F.3d 785, 798 (1st Cir.

---

on this basis rather than based on a discriminatory animus. *See Thompson v. Coca-Cola Co.*, 522 F.3d 168, 177 (1st Cir. 2008) ("[T]he question is not whether [plaintiff's] or his fellow employees' version is the true one, but whether [the decisionmaker] believed what [he] had been told.") (citation modified) (quoting *Ronda Pérez v. Banco Bilbao Vizcaya Argentaria Puerto Rico*, 404 F.3d 42, 45 (1st Cir. 2005)); *see also Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 67 (1st Cir. 2008) ("When assessing a charge of pretext in an employment discrimination case, the focus is on the mindset of the actual decisionmaker."); *Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc.*, 425 F.3d 67, 76–77 (1st Cir. 2005) (determining that a "report and physician statements" were not hearsay because they were not offered to prove that the plaintiff engaged in misconduct, but rather to demonstrate that his superiors had reason, based on a thorough investigation, to believe that he had").

2014) (noting that even if employer's understanding of "disorderly or disruptive" behavior was overbroad, there was "nothing on the record to suggest that it was discriminatory, or otherwise in violation of the employer's own policies"). Ferrao attempts to force an inference of discriminatory motive by relying on "conclusory allegations, improbable inferences, and unsupported speculation," whereas the PRDE has provided an "obvious, non-discriminatory explanation for its conduct." *See Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 13 (1st Cir. 1994); *Deangelis*, 165 F.4th at 659. As such, Ferrao fails to create a genuine factual dispute as to Rosario's discriminatory motive.

Furthermore, even if—taking Ferrao's account as true—Rosario harbored religious animus against him, Ferrao's claim faces two subsequent hurdles. First, Rosario testified, and Ferrao did not dispute, that she never broached the topic of Ferrao's conduct directly with the ultimate decisionmaker, the PRDE secretary. (ECF No. 102-2 at 6). Second, the PRDE legal division conducted two independent investigations into Ferrao's conduct over the span of several years, interviewing several dozen parents, students, and teachers, and recommended disciplinary action against him. (ECF Nos. 99-1, 99-2). The existence of these independent investigations severs the causal link running from Rosario's alleged animus to the two PRDE secretaries in office during Ferrao's disciplinary process, and therefore causally supersedes any purported animus Rosario may have harbored. *See Staub*, 562 U.S. at 421 (explaining that a supervisor's bias may not be imputed to an employer where the employer conducted an independent investigation that "apart from the supervisor's recommendation" was "entirely justified"); *see also Rodriguez v. Dept. of the Army*, No. CV 16-1000 (MEL), 2018 WL 6047641, *7, 2018 U.S. Dist. LEXIS 196189, *20 (D.P.R. Nov. 15, 2018) (collecting cases and explaining that "numerous circuit courts have held that under the cat's paw theory, 'the causal link between the protected conduct and termination is broken where the [decision-maker] ... conducts an "independent investigation" in the course of reaching his or her decision"') (internal citations omitted). Thus, Ferrao's claim independently fails as a matter of law under a cat's

paw theory.

In sum, although the Court acknowledges the First Circuit's guidance to be "particularly cautious" in granting summary judgment when discriminatory motive may be at issue, the evidence of discrimination Ferrao has adduced is "so weak" that it cannot "deflect the swing of the summary judgment scythe." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983); *Ahern,* 629 F.3d at 54; *Kosereis,* 331 F.3d at 216; *see also Smith*, 40 F.3d at 13 ("Even in an employment discrimination case, 'where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'") (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Simply put, Ferrao fails to create a genuine issue of material fact that the cited "instances of orderly discipline" were a "subterfuge for discrimination," and therefore that religious discrimination was a motivating factor in his suspension. *Perez-Abreu*, 2024 WL 4544710, *11, 2024 LX 243348, *31; *see also Kinzer v. Whole Foods Market, Inc.*, 99 F.4th 105, 116 (1st Cir. 2024) ("Title VII does not render employers powerless to enforce nondiscriminatory workplace rules, as '[a]n employer remains entitled to loyalty and cooperativeness from employees.'") (quoting *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 230 (1st Cir. 1976)). Defendants' motion for summary judgment is **GRANTED** as to the religious discrimination claim.

**b. Retaliation**

Ferrao's retaliation claims fares no better. To succeed, Ferrao must establish that (1) he "engaged in protected conduct," (2) he "suffered an adverse employment action," and (3) "a causal nexus exists between the protected conduct and the adverse action." *Rodríguez-Severino v. UTC Aerospace Sys.*, 52 F.4th 448, 463 (1st Cir. 2022). An employee has engaged in "protected conduct" when he has either (1) "opposed any practice made an unlawful employment practice by Title VII" or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

under Title VII." *Fantini v. Salem State College*, 557 F.3d 22, 32 (1st Cir. 2009) (citing *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996)). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Id.* (citing *Cruz v. Coach Stores Inc.*, 202 F.3d 560, 566 (2nd Cir. 2000)). Oppositional conduct has been broadly interpreted to mean conduct that "effectively and purposefully communicates the employee's opposition" to unlawful employment practice, and includes "picketing and boycotting an employer." *Kinzer*, 99 F.4th at 116 (quoting first *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 108 (1st Cir. 2015); and then *Collazo v. Bristol–Myers Squibb Mfg., Inc.*, 617 F.3d 39, 47–48 (1st Cir. 2010)). Unlike discrimination claims, retaliation claims under Title VII retain a "but for" causation requirement. *See Stratton v. Bentley U.*, 113 F.4th 25, 44 (1st Cir. 2024). This requirement is intended to protect "against a poor-performing employee shielding themselves from termination by the mere fact that they engaged in protected conduct." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 358 (2013)). Because, as a matter of law, no reasonable juror could find that the but-for causation standard has been met, Ferrao's retaliation claim also fails at the prima facie stage. *See id.*

Defendants do not dispute that Ferrao's summary suspension constituted an adverse employment action.[7] (ECF No. 118 at 10). Due to the broad interpretation courts afford to oppositional conduct, the Court also assumes, for purposes of this motion, that Ferrao engaged in a protected activity by participating in the November 2022 protest.[8] *See Kinzer*, 99 F.4th at 116.

[7] Although Ferrao was subsequently terminated from his employment in 2024, after this action was instituted, the adverse employment action at issue for purposes of summary judgment is his December 2022 suspension. (ECF No. 34).

[8] This is a generous reading of the record in a light favorable to Ferrao. *See Hochstadt*, 545 F.2d at 233 (stating that an employee may not avail himself of Title VII protections when his conduct exceeds "the scope of protected opposition" and harms the employer's "interest in maintaining a harmonious and congenial working environment"). Ferrao claims his conduct was not disruptive because he was "off-duty" from his precautionary measures job, and that the protest was held right after school hours at the end of the day. (ECF No. 100 at 11). Defendants dispute this account and argue that the school day had not yet ended when the protest began. (ECF No. 118 at 13). Ferrao's own exhibit describes

Therefore, the only issue at this stage is whether the record reveals a but-for causal connection between Ferrao's purported protected activity and his summary suspension. *See Stratton*, 113 F.4th at 44 ("[A] retaliation claim cannot rest on evidence that a plaintiff's protected activity was merely one of the employer's motivations for an adverse action."). As the undisputed record shows, Ferrao's suspension was preceded by a years-long disciplinary process that initiated in 2019. (ECF Nos. 99-1, 99-2). As such, he fails to create a genuine dispute as to but-for causation. *See id.*

Relying on *Clark County School District v. Breeden*, Defendants contend that Ferrao's suspension was the result of prior investigations into his classroom conduct pursuant to PRDE regulations. (ECF No. 118 at 15); *see* 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Indeed, they claim that Ferrao "cannot establish the requisite causal connection merely because a subsequent step in the preexisting process occurred after his protected activity." (ECF No. 85 at 31–32). Ferrao argues the opposite. He claims that the preexisting disciplinary process against him is not the cause of his suspension because *Breeden* only protects employers "proceeding along lines previously contemplated." (ECF No. 100 at 13). Here, in contrast, Ferrao claims that his pre-existing investigation is distinguishable from his December disciplinary action because the previous disciplinary process related only to his refusal to participate in the teacher substitution plan, and that, in any case, the PRDE did not "act on or begin any investigation, until years later after plaintiff publicly protested." (ECF No. 101 at 29). Moreover, Ferrao relies on the fact that the December 2022 letter added eleven new charges related to his protest to argue that an investigation that "absorbs protected activity into its charges" cannot be saved by pointing to a previously ongoing disciplinary process.

---

the protest as including "high-volume loudspeakers," where Ferrao was "shouting insults directed at the principal," making students, clearly still at the School, feel "anxious." (ECF No. 101-28 at 1).

(ECF No. 100 at 13).

First, although the temporal proximity between the protest and his suspension may be probative of retaliatory motive, it is but one factor to consider, and it may be undermined if the "surrounding circumstances" clearly point against retaliation. *See Straton*, 113 F.4th at 45 ("It is true that an inference of causation may be appropriate where there is close temporal proximity between protected activity and an adverse action."); *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 720 (1st Cir. 2014) ("But while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough …."). By the time of the protest, Ferrao had already been placed in precautionary measures status for unrelated reasons, and before that, the disciplinary process against him had already been well underway for over two years. *See Frith*, 38 F.4th at 277 (1st Cir. 2022) ("[T]o establish that an adverse employment action was caused by an employee's protected activity, the employer's decision to act adversely to the employee must postdate the protected activity.").

As Ferrao observes, no disciplinary action was taken against him prior to 2022, and some of the student interviews that appeared in the suspension letter were conducted the week after the protest occurred. (ECF No. 100 at 13). However, the "larger picture" here severely undercuts a finding of retaliation. *See Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (explaining that temporal proximity does not establish causality by itself, especially if "[t]he larger picture undercuts any claim of causation") (quoting *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)). The undisputed record shows that between 2019, when Ferrao was first referred to the legal division, and 2022, when disciplinary action began against him, the PRDE investigated and collected testimony regarding his conduct. (ECF No. 99-1). The fruits of this investigation were issued in a February 2022 report containing sworn testimony dating from 2019 to 2021. (*Id.*). As such, the charges against him did not "lay dormant" for three years, as he claims. (ECF No. 100 at 13). Moreover, Ferrao learned of this

investigation and the PRDE's intent to bring disciplinary charges against him in March—almost nine months before Ferrao participated in the protest. (ECF No. 101-5 at 1). Last, the November student interviews which Ferrao claims were the result of his protest, were scheduled before the protest occurred. (ECF No. 102-1 at 11, 63). Therefore, the "larger picture" here undercuts any inference of causal connection that temporal proximity between the protest and his suspension may initially suggest. *See Wright*, 352 F.3d at 478.

Second, and central to Ferrao's retaliation claim, is that eleven of the charges in the December suspension letter relate to his participation in the November protest. (ECF No. 100 at 3). This showing gets Ferrao closer to the mark, however, it still falls short of the but-for causation benchmark. Even though Ferrao is not required to show that retaliation was the *only* cause of the PRDE's actions, he must show that "the adverse action would not have occurred in the absence of the retaliatory motive." *See Moreta v. First Transit of PR, Inc.*, 39 F. Supp. 3d 169, 181 (D.P.R. 2014). Here, both the March and December 2022 disciplinary letters cite as grounds for discipline, among other things, a string of complaints against Ferrao including: "insubordination for refusing to comply with the substitution plan, showing R-rated films containing mature, sexual content to minors, to challenging students and parents after they reported their discomfort and fears for their safety." (ECF No. 85 at 2–3). Therefore, even if Ferrao had not participated in the protest, the PRDE would still have had numerous valid non-retaliatory grounds to discipline him.

Furthermore, if the Court were to accept Ferrao's view and conclude that an employer's consideration of legitimate reasons along with an arguably non-legitimate retaliatory purpose may satisfy the but-for causation standard, a retaliation claim would be no different than a mixed-motive discrimination claim. The Supreme Court expressly rejected this approach in *Nassar*, warning that such a result would permit employees who know they are on thin ice to shield themselves from termination "by the mere fact that they engaged in protected conduct." *Nassar*, 570 U.S. at 358; *see also Yelling v. St.*

*Vincent's Health System*, 82 F.4th 1329, 1340 (11th Cir. 2023) (explaining that "[w]here but-for causation is required, a plaintiff with evidence of only a tagalong 'forbidden consideration' cannot meet her summary judgment burden because she cannot show 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'") (quoting *Nassar*, 570 U.S. at 360). Indeed, the Court in *Nassar* explained that even if an "employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage." *See Nassar*, 570 U.S. at 358. What is more, as written, the disciplinary charges in the December letter relating to the protest did not fault Ferrao simply for having protested. Rather, the PRDE took issue with the disruptive way in which it was carried out. *See Hochstadt*, 545 F.2d at 233 (noting that an employer's "interest in maintaining a harmonious and congenial working environment .... does not afford an employee unlimited license to complain at any and all times and places").

Last, Ferrao's attempt to distinguish his previously ongoing disciplinary process against him by claiming that he was originally referred to the legal division because of his refusal to comply with the teacher substitution plan, and then the PRDE escalated the process after the protest is unavailing. *See Kinzer*, 99 F.4th at 117 (explaining that a Title VII plaintiff claiming retaliation "must show that any retaliatory discipline was distinguishable from [a] preexisting and ongoing discipline of employees") (citation modified). The record shows that the disciplinary proceedings against him did not exclusively relate to his participation in the protest, or his to his refusal to participate in the teacher substitution plan, for that matter. (ECF No. 101-5 at 1). Further, as conceded by Ferrao, the PRDE legal division investigators considered the protest "just one small example" of Ferrao's broader disciplinary record. (ECF No. 127 at 7). As such, on this record, a reasonable jury could not conclude that Ferrao's participation in the protest was the but-for cause of his suspension. Summary judgment is therefore **GRANTED** as to the retaliation claim.

**c. Pretext**

Lastly, although Ferrao bases his discrimination claim on a motivating-factor theory, he nonetheless throws all but the kitchen sink to claim why any purported reason to terminate him is a pretextual cloak for religious and retaliatory animus. (ECF No. 100 at 14); *see Burns*, 829 F.3d at 12 (explaining that plaintiffs proceeding under a mixed-motives approach need not resort to the *McDonnell Douglas* burden-shifting framework). Even though, as discussed above, the Court finds that Ferrao has neither successfully articulated a prima facie case nor generated a genuine dispute of material fact as to religious discrimination or retaliation, the Court also finds his attempts to dislodge the PRDE's legitimate explanations unavailing.

Under *McDonnel Douglas*, once the PRDE has articulated legitimate reasons for his suspension, which it has, Ferrao must adduce sufficient evidence to create a genuine dispute "that not only that the reason articulated by the employer was a sham," but also that the PRDE's "true reason" was animus against a protected characteristic. *Rodríguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 19 (1st Cir. 1999). Pretext may be demonstrated "through a showing that an employer has deviated inexplicably from one of its standard business practices," or through comparator evidence tending to show that similarly situated employees were treated differently for substantially similar conduct, but in any case, pretext "means more than an unusual act; it means something worse than business error; pretext means deceit used to cover one's own tracks." *Kouvchinov*, 537 F.3d at 68; *Luceus v. Rhode Island*, 923 F.3d 255, 259 (1st Cir. 2019); *Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria*, 404 F.3d 42, 45 (1st Cir. 2005). Ferrao's attempt to create a genuine dispute as to pretext, however, "merely rehashes" his qualms against the PRDE's finding of insubordination and inappropriate workplace conduct, and for many of the same reasons as discussed before, does not pass muster. *See Hernandez v. Blanche*, 181 F.4th 149, 166 (1st Cir. 2026).

As comparative proof of pretext, Ferrao first points to a February 2022 faculty protest where

teachers and students held banners outside the School around lunchtime requesting higher salaries. (ECF No. 100 at 12). He claims that this protest amounted to the "same acts" of the November protest but was treated differently by the PRDE because it pertained merely to salaries whereas the November protest was punished because it "opposed discrimination." (*Id.* at 12). For one, Ferrao testified that he was also present at the February protest, so the comparative value of this evidence is somewhat strained. (ECF No. 101-14 at 378); *see Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999) (explaining that to successfully raise an inference of disparate treatment by relying on comparative evidence, a plaintiff must show that "*others* similarly situated to him in all relevant respects were treated differently by the employer") (emphasis added). Second, according to Ferrao's own exhibit, the November protest was held on or about parent pick-up time, featured loudspeakers, contained insults directed at the principal, and forced the activation of the School's emergency protocol whereby the students had to be evacuated through the School's rear entrance. (ECF No. 101-28 at 1). Even if the Court assumes that the November protest constitutes a protected activity, it cannot stretch that finding to conclude that the February protest was similar "in all relevant respects." *Id.*

Ferrao also claims that PRDE has offered "shifting explanation" to justify his suspension because the "Answer grounds the suspension in the substitution plan, language, and films. The letter adds the protest, religion, and recordings. The motion now adds unfitness, and recasts protest charge as 'disruption.'" (ECF No. 100 at 14). But the PRDE never disavowed any of the previous reasons it cited to terminate him, but rather included new ones based on subsequent conduct. As Ferrao concedes, the first five charges of the December letter recite the same charges in the March letter. (ECF No. 127 at 6). The new charges listed in December stemmed from later events, such as his recording of coworkers while he was under precautionary measures, and the charges tied to the protest. (ECF No. 90-14). The PRDE did not later "recast" the protest charges as "disruption" in the

pleadings, as Ferrao contends. (ECF No. 100 at 14). The suspension letter itself stated that the "incident disrupted the entire school climate." (ECF No. 90-14). As such, Ferrao was on notice that the PRDE was bringing insubordination charges against him, at the very least, since early 2022, and the consistent narrative, supported by the record, is that he was undergoing a disciplinary process for insubordination. His activities after he was placed under precautionary measures merely compounded the already existing charges rather than being "after-the-fact justifications, provided subsequent to the beginning of legal action." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000).

Next, Ferrao contends that the PRDE departed from its own rules because the PRDE regulation cited in his suspension letter states that teachers may be removed from a school only when there is a "real or potential danger" to students. (ECF No. 100 at 14). Furthermore, he claims that Rosario "skipped her own meet-first practice," ostensibly by referring him to the legal division without first informing him. (*Id.*). However, Ferrao's own PSAMF cites the provision as requiring "reasonable grounds that there is an actual or potential situation of danger to the health, life, safety, property or morals of students, employees and the general public," a broader listing than what his argument might suggest. (ECF No. 102-1 at 65). In any case, this Court need not determine whether the PRDE's assessment that Ferrao's protest posed a risk to the safety or morals of students was overbroad. *See Pina*, 740 F.3d at 798 ("Even if [employer's] understanding of 'disorderly or disruptive' behavior was overbroad, there is nothing on the record to suggest that it was discriminatory…."). Moreover, Ferrao relies on Rosario's deposition testimony stating that it was her practice to meet first with teachers before referral, not that any PRDE rule compelled her to do so. *See Kouvchinov*, 537 F.3d at 68 ("The most obvious flaw in the fabric of this argument is that the plaintiff has not produced any competent evidence establishing that [the employer] had a standard policy or practice of hearing employees out before discharging them."). Therefore, Rosario was not deviating from any PRDE protocol.

Furthermore, the uncontroverted record confirms that Rosario did attempt to meet with Ferrao twice in 2019 before referring him to the legal division but the meeting was not held because Ferrao was not accompanied by a PRDE approved union lawyer. (ECF No. 102-2 at 7).

Moving on, Ferrao claims that his disciplinary charges were "measured against later rules" because the teacher substitution plan he refused to comply with "was expressly extended to the school's 90-minute schedule in April 2022, and the requirement that teachers obtain validation of supplementary materials was first imposed in October 2022," both events occurring after Ferrao's 2019 referral to the legal division. (*Id.*). The PRDE however, never claimed that the substitution plan stemmed from a department-wide "circular letter," as Ferrao claims. Rather, the record shows that the substitution plan was ratified by School faculty in a May 2019 internal meeting. (ECF No. 97-1). Therefore, regardless of whether a circular letter made it a department-wide mandate, it was already standard practice in the School since well before. Indeed, as Ferrao conceded, "most of the academic teachers followed" it. (ECF No. 102-1 at 49). As to the validation of supplemental materials, Ferrao seems to have abandoned this argument after the correction of his PSAMF.[9]

Ferrao also contends that "contemporaneous praise" for his performance cannot be squared with disciplinary action against him because his evaluations ranged from 94% to 100%. (ECF No. 100 at 14). But the only evidence he produces in support of this argument is performance evaluations dating from 2016 to 2019—three years before his suspension. (ECF 102-1 at 60). A performance review preceding the actionable adverse employment action by three years can hardly be said to be proof that the reasons stated in 2022 to suspend Ferrao were pretextual.

Last, Ferrao contends that the disciplinary process against him was defective because the

[9] Following Ferrao's discovery of incorrect record citations which did not track the language of his exhibits' certified English translations, the Court granted Ferrao leave to correct his PSAMF. (ECF No. 102 at 1).

"decision [to suspend him] rested on written statements, with no live witnesses and no cross-examination." (*Id.*). It is not this Court's duty, however, to assess the sufficiency of State disciplinary procedures, but rather to determine whether an adverse employment decision was the product of discrimination or retaliation. *See Rodríguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 48–49 (1st Cir. 2019) ("[T]o survive summary judgment, '[i]t is not enough for [a plaintiff] merely to impugn the veracity of the employer's justification' or to point to flaws in [the employer's] investigation.") (quoting *Mesnick*, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions.")). In all, Ferrao's proof of the PRDE's purported "deficiencies" or "inconsistencies" fails to create a genuine dispute of fact as to pretext. *See Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 41 (1st Cir. 2013) ("[M]ere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext.") (quoting *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 140 (1st Cir. 2012)). On this record, no reasonable juror could conclude that the PRDE's reasons to suspend Ferrao were a sham lacking "any legitimate explanation." *Farid v. Trustees of Dartmouth College*, 181 F.4th 193, 206 (1st Cir. 2026).

## CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED**.

In San Juan, Puerto Rico this November 6, 2026 .

***s/ Mariana E. Bauzá-Almonte***

MARIANA E. BAUZÁ-ALMONTE

United States Magistrate Judge